UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X

JASON PAGAN,

                          Plaintiff,

            -v-

CSC a/k/a CABLEVISION SYSTEMS CORP.,

                         Defendant.

------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: July 3, 2018

17-cv-1271 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

On February 23, 2017, Jason Pagan ("plaintiff" or "Pagan") commenced this disability discrimination action against his former employer, Cablevision Systems Corp. ("defendant" or "Cablevision"). (See Compl., ECF No. 2.) Pagan alleges, in sum, that Cablevision discriminated against him, failed to accommodate his disability, and created a hostile work environment in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112 et seq. (See generally id.)

Currently pending before the Court is Cablevision's motion for summary judgment pursuant to Fed. R. Civ. P. 56(c) ("Rule 56"). (ECF No. 25.) Plaintiff opposed that motion on February 22, 2018 (ECF No. 31), and Cablevision replied on March 2, 2018 (ECF No. 75).

For the reasons discussed below, the Court hereby GRANTS Cablevision's motion for summary judgment.

I.    BACKGROUND

The following facts are taken from the parties' respective submissions under

Local Civ. R. 56.1, and are undisputed unless otherwise noted.[1]

A.    <u>The Parties</u>

Cablevision is a cable television and internet provider with operations in and

around New York City.  (<u>See</u> Resp. to Def.'s Local Civ. R. 56.1 Statement ("Pl.'s

56.1 Resp.") ¶ 1, ECF No. 35.)  In September 2007, Cablevision hired Pagan as a

"Field Service Analyst."  (<u>Id.</u> ¶ 5.)  In that role, Pagan was responsible for, <u>inter</u>

<u>alia</u>, addressing and resolving computer problems (referred to as "tickets") reported

by other Cablevision employees in his assigned territory.  (<u>Id.</u>)  Pagan remained

employed by Cablevision as a Field Service Analyst until his termination on or

around April 4, 2016.  (<u>Id.</u> ¶ 32.)

B.    <u>Pagan's Job Performance and Termination</u>

Beginning in 2008 and continuing through 2012, Pagan's supervisor Roland

Eberhard ("Eberhard") included a series of criticisms regarding Pagan's job

performance—specifically, his failure to close tickets in a sufficiently timely

fashion—in Pagan's yearly performance appraisals:

- In 2008, Pagan's annual performance appraisal indicated that his

    ticket closure rate "was falling outside . . . Departmental guidelines,"

---

[1] Pursuant to Local Civ. R. 56.1(c), "[e]ach numbered paragraph in the statement of material facts . . . will be deemed to be admitted . . . unless specifically controverted . . . in the statement required to be served by the opposing party."  There are numerous instances where, although plaintiff "disputes" a fact in form, he does not actually controvert the fact in substance (e.g., where he disputes the justification underlying a negative performance review or comment, but does not deny that he actually received the negative review or comment).  In all such instances, defendant's asserted facts are deemed admitted to the extent they are properly supported.

and that "[s]ome of his tickets still tend to age a little." (See Decl. of Peter A. Walker ("Walker Decl.") Ex. F at 2, ECF No. 26-4.) Although Pagan received an overall rating of "Achieved Expected Performance," the appraisal indicated that "Jason needs to work on resolving his tickets within specified departmental guidelines." (Id. at 4.)

- In 2010, Pagan's annual performance appraisal contained a similar criticism, noting that "Jason should be able to accomplish more in his day based on his work load and responsibilities." (Walker Decl. Ex. G at 2, ECF No. 26-4.) Although the appraisal noted some slight improvement, it indicated that Pagan "needs to better utilize his time to accomplish more in his day." (Id. at 5.) Pagan once again received an overall rating of "Achieved Expected Performance." (Id. at 4.)

- In 2011, Pagan's annual performance appraisal noted that "his average close time is 2.5 days, which is above the 2 day average departmental SLA." (Walker Decl. Ex. H at 5, ECF No. 26-4.) Although Pagan once again received an overall rating of "Achieved Expected Performance," the appraisal contained an explicit goal for Pagan to reduce his ticket closure time. (Id. at 4-5.)

- In 2012, Pagan's annual performance appraisal noted that he "has the fewest tickets closed for the entire group," and that he "needs to work on his sense of urgency and ownership of making things happen in a [sic] effort to get tickets resolved more timely and efficiently, yet

correctly." (Walker Decl. Ex. I at 2, ECF No. 26-5.) The appraisal further noted that Pagan "must do whatever it takes" to close a minimum of five tickets per day on average and "must get his closure time to within our departmental SLA", and that "[t]here needs to be consistent improvement within 3 months or we will meet again to further address this matter." (Id. at 4-5.) Pagan's overall rating was once again "Achieved Expected Performance." (Id. at 4.)

In 2013, a different manager, Brian Valente ("Valente") began supervising Pagan and completing his annual performance reviews. As reflected below, those reviews noted more serious concerns with Pagan's job performance:

- In 2013, Pagan's year end performance review, though mostly positive, noted that "Jason needs improvement in his technical[] competencies; at time challenging issues seem to take longer to resolve." (Decl. of Brian Valente ("Valente Decl.") Ex. B at 3, ECF No. 27-2.) The review further noted that Pagan had a higher-than-average rate of reopened tickets, and a significantly lower-than-average rate of remotely closed tickets. (See id. at 4.)

- In 2014, Pagan received an overall rating of "Requires Improvement" for the first time. (Valente Decl. Ex C at 9, ECF No. 27-3.) Valente wrote that "Jason's overall performance this year has not been impressive," and identified "areas in Jason's support that need a major improve[ment]," including "ticket closures, addressing older tickets,

[and] awareness of areas needs." (Id.)  The review specifically noted that Pagan opened 440 fewer tickets than average, and closed 465 fewer tickets than average.  (Id. at 6.)  Additionally, the review noted that Pagan's "[d]aily closure numbers are not impressive," and that "tickets not being addressed in a consiterate [sic] time period impact[s] the customer causing a lack in their productivity."  (Id. at 8.)

- In 2015, Pagan received a mid-year review (the "2015 Mid-Year Review") that acknowledged some improvement, but noted "Jason's closure and remote numbers are still amongst the lowest in the group." (Valente Decl. Ex. E at 4, ECF No. 27-5.)

- Subsequent to the 2015 Mid-Year Review, in July 2015, Valente placed Pagan on a "Performance Improvement Plan" (the "2015 PIP"). (Valente Decl. Ex. F, ECF No. 27-6.)  The 2015 PIP was designed to "focus [Pagan's] attention on substantially improving [his] performance in several key areas."  (Id.)  The 2015 PIP included four goals, including: (1) increasing and sustaining daily ticket production; (2) controlling and balancing the support area; (3) improving ticket management; and (4) improving decisionmaking.  (See id.)

- In 2015, Pagan once again received an overall rating of "Requires Improvement" for his year-end review.  (Valente Decl. Ex. D at 14, ECF No. 27-4.)  Valente stated "I have seen no improvement since last years review where Jason was rated as Requires Improvement; this

5

was even brought [to Jason's] attention during his mid year review that he needed to start improving on his numbers and overall workload." (Id. at 15.) Valente further stated that Jason "continuously needs to be contacted and followed up on to review his daily ticket closures," and that he was "not confident that a whole days work is being put in on a daily basis." (Id.)

On January 8, 2016, Valente met with Pagan to discuss his overall job performance in 2015. (Pl.'s 56.1 Resp. ¶ 27.) During that meeting, Valente informed Pagan that in 2015, he closed 4.45 fewer tickets per day than average, and 1.1 fewer tickets per day than the minimum requirement of 8. (Id.) As a result, and due to Pagan's "lack of improvement," Valente informed Pagan that he was putting him on a "30 Day Action plan" (the "2016 PAP"). (See Valente Decl. Ex. G, ECF No. 27-7.)

The 2016 PAP was put into place on February 10, 2016. (See Valente Decl. Ex. H, ECF No. 27-8.) It informed Pagan "[y]ou are being given this action plan for not meeting the expectation of Field Service Analyst for the second year in a row," and that "[d]espite numerous coaching and development actions . . . you continue to perform below the level expectations." (Id. at 2.) The 2016 PAP gave Pagan 30 days to improve his performance in a number of areas, and warned him that if he was unable to improve and sustain improvement, he would be "subject to further corrective action up to and including termination of [his] employment." (Id. at 3.)

Pagan signed the 2016 PAP and thereby acknowledged his understanding of its contents on February 10, 2016.  (Id.)

During the course of the 2016 PAP, Valente took detailed daily notes regarding Pagan's job performance.  (See Valente Decl. Ex. I, ECF No. 27-9.)  Those notes contain a litany of criticisms consistent with the deficiencies Valente had previously identified.  (See generally id.)  Cablevision terminated Pagan's employment on or around April 4, 2016.  (Pl.'s 56.1 Resp. ¶ 32.)

C.     Pagan's Medical Issues and Requests for Accommodation

Pagan suffered a heart attack in or around mid-September 2015.  (See Pl.'s 56.1 Resp. ¶ 21.)  For reference, that heart attack occurred after Pagan was placed on the 2015 PIP, but before he was placed on the 2016 PAP.  As a result of the heart attack, Pagan was granted a medical leave of absence from September 14, 2015 through October 13, 2015, which was subsequently extended to December 1, 2015. (Id.)  Pagan returned to work on December 1, 2015 and was approved for one hour of intermittent FMLA leave three times per week until May 30, 2016 to allow for cardiac rehab. (See Pl.'s 56.1 Resp. ¶ 22.)

It is undisputed that when he returned to work, Pagan requested (based on his physician's recommendation) an accommodation to avoid heavy lifting until February 1, 2016.  (See Pl.'s 56.1 Resp. ¶ 23.)  Defendant claims, and Pagan does not sufficiently controvert[2], that it provided such an accommodation by assigning

---

[2] Pagan relies on argument in his memorandum of law and the declaration of Bret Citrin ("Citrin"), a former Senior Field Service Analyst at Cablevision, to rebut Cablevision's assertion that it provided an accommodation for Pagan's lifting restriction.  (See Pl.'s 56.1 Resp. ¶¶ 23-24.)  But mere argument is insufficient to create a triable issue of fact, and Citrin only declared that he was "not

another Cablevision employee, John Chen ("Chen") to assist Pagan with heavy lifting. (See Def.'s Local Civ. R. 56.1 Statement ("Def.'s 56.1") ¶¶ 23-24, ECF No. 30.) Defendant further claims that upon Pagan's return to work, Valente advised Pagan to "stay local" and resolve tickets remotely as much as possible. (See Def.'s 56.1 ¶ 25.) Pagan does not dispute that Valente preferred tickets to be resolved remotely, but argues the nature of his territory made it necessary to resolve a high number of tickets in the field. (Pl.'s 56.1 Resp. ¶ 25.)

D.     Procedural History

After being terminated on or around April 4, 2016, Pagan commenced this action against Cablevision on February 23, 2017. (See generally Compl.) Though Pagan's complaint is not a model of clarity (and includes only two formal causes of action), it contains essentially three allegations: (1) that Cablevision failed to provide him with a reasonable accommodation following his heart attack (id. ¶¶ 14-20); (2) that Cablevision discriminated against him based on a medical disability (id. ¶¶ 21-22); and (3) that Cablevision created a "hostile and abusive working environment" (id. ¶¶ 23-24). All of Pagan's claims were brought pursuant to the ADA.

Cablevision moved for summary judgment on February 2, 2018, arguing that Pagan was terminated for "habitually poor performance, which was consistently

---

aware of any accommodations offered by Cablevision."  (See Decl. of Bret Citrin ("Citrin Decl.") at ¶ 8, ECF No. 32.)  That statement, standing alone, does not sufficiently controvert Cablevision's sworn assertion that it provided an accommodation.  Further, critical portions of the Citrin Declaration lack adequate foundation, as they simply mirror Pagan's allegations and rely on Citrin's "suspicions" regarding why Pagan was terminated.

documented and reflected in his performance evaluations," and therefore Pagan's ADA claims must be dismissed.  (See Def.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 1, ECF No. 29.)  Pagan opposed that motion on February 22, 2018 (ECF No. 31), and Cablevision replied on March 2, 2018 (ECF No. 75).

II.    LEGAL PRINCIPLES

    A.    Summary Judgment Standard

Summary judgment may be granted when a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court's role is to determine whether there are any triable issues of material fact, not to weigh the evidence or resolve any factual disputes.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

In reviewing a motion for summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial.  Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by

themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted).

B.      The ADA

Broadly, the ADA makes it unlawful for an employer, with respect to hiring or discharge, to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). Such discrimination can take place in a variety of ways, including inter alia through failure to accommodate and through creation of a hostile work environment. The elements for each are described below.

1.      Disability Discrimination

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show: "(a) that his employer is subject to the ADA; (b) that he is disabled within the meaning of the ADA or perceived to be so by his employer; (c) that he was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) that he suffered an adverse employment action because of his disability." Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008) (citing Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004)). Under the last element, a plaintiff must show that the adverse employment action "took place under circumstances giving rise to an inference of discrimination." Davis v. New York City Dep't of Educ., 804 F.3d 231, 235 (2d Cir. 2015) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir.2000)). The

Second Circuit has held that "[d]iscriminatory intent may be inferred from the totality of the circumstances."  Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir. 2002) (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 425 (2d Cir. 1995)).

Once a plaintiff makes a prima facie case of discriminatory motivation, "the burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action" pursuant to McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Davis, 804 F.3d at 235.  If the employer succeeds in setting forth a non-discriminatory justification, "the plaintiff must then produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination."  Id. (citing, inter alia, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

2.      Failure to Accommodate

To establish a prima facie case of discrimination based on failure to accommodate, a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations.  See Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006).  Importantly, "[a] reasonable accommodation can never involve the elimination of an essential function of a job."  Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) (citing Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991)).  "The term 'essential functions,' which is not defined in the

statutes themselves, is generally defined in ADA regulations . . . to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)).  The considerations in the regulations are "fact-intensive" and "no one listed factor will be dispositive." Id.

The plaintiff bears the burdens of both production and persuasion as to "the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment," as well as "whether the costs of the accommodation do not on their face obviously exceed the benefits." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 & n.3 (2d Cir. 2009).  "An ADA plaintiff does not satisfy [his] burden to identify a potential accommodation merely by reciting the formula that [his] employer could have reassigned [him]." McBride, 583 F.3d at 97.

Assuming plaintiff can make out a prima facie case, the burden would then shift to defendant under the analysis of McDonnell Douglas Corp., to show a legitimate, nondiscriminatory purpose for its allegedly adverse action.  See Raytheon Co. v. Hernandez, 540 U.S. 44, 49-50, (2003); Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 48-49.

3.      Hostile Work Environment

Hostile work environment claims brought under the ADA are evaluated under the same standard as hostile work environment claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.  See, e.g., Monterroso v. Sullivan & Cromwell, LLP, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (citation

omitted).  To establish a hostile work environment under that standard, a plaintiff "must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015) (internal quotation omitted). "The incidents complained of 'must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Id. (quoting Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014)).

III.    DISCUSSION

As a threshold matter, the Court has serious reservations as to whether Pagan has sufficiently demonstrated that "he is disabled within the meaning of the ADA or [was] perceived to be so by his employer." Brady, 531 F.3d at 134.  A person is only considered disabled as a matter of law if they have "a physical or mental impairment that substantially limits one or more major life activities" (or, if they have a "record of such impairment" or are "regarded as having such an impairment"). See 42 U.S.C. § 12102(1) (emphasis added); Widomski v. State Univ. of N.Y., 748 F.3d 471, 474 (2d Cir. 2014).  "Courts within this [C]ircuit, and the vast majority of courts elsewhere which have considered the question, have held that temporary disabilities do not trigger the protections of the ADA because individuals with temporary injuries are not disabled persons within the meaning of the act." Dudley v. N.Y.C. Housing Auth., 2014 WL 5003799, at *34 (S.D.N.Y.

Sept. 30, 2014) (alteration in original) (quoting <u>Graaf v. N. Shore Univ. Hosp.</u>, 1 F. Supp. 2d 318, 321 (S.D.N.Y. 1998)).

Although Pagan has alleged three distinct injuries (a leg injury in 2014, a fractured hand in 2015, and a heart attack in 2015) that may form the basis of a covered disability, he has made virtually no effort to demonstrate how or why any of those injuries "substantially limit[] one or more major life activities."[3] Further, Pagan has not explained why any of those injuries, even if they did substantially impact a major life activity, were not merely temporary. The Court can certainly speculate as why the heart attack in particular might render Pagan "disabled" under the ADA (because, for instance, he may have an underlying heart condition), but Pagan himself carries the initial burden of making a <u>prima facie</u> case for all three of his claims.

All that being said, because this issue was not addressed by the parties and because resolution is not necessary to the Court's holding, the Court moves on to address other deficiencies with Pagan's case. The Court addresses each of Pagan's ADA claims separately.

A. <u>Disability Discrimination</u>

Pagan alleges that Cablevision discriminated against him on the basis of his disability, in violation of the ADA. (<u>See</u> Compl. ¶¶ 21-22.) As previously noted, to establish a <u>prima facie</u> case of discrimination, plaintiff must demonstrate, <u>inter</u>

---

[3] Pursuant to the ADA, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

alia, that "he suffered an adverse employment action <u>because of</u> his disability."

<u>Brady</u>, 531 F.3d at 134 (citation omitted) (emphasis added). The Second Circuit has interpreted this to require proof that the adverse employment action "took place under circumstances giving rise to an inference of discrimination." <u>Davis</u>, 804 F.3d at 234 (internal quotation omitted). Here, plaintiff has failed to create a triable issue that such circumstances existed.

In opposing summary judgment, plaintiff points to the following as evidence of Cablevision's alleged discriminatory behavior: (1) a series of negative performance reviews by Valente; (2) Valente's comment, following plaintiff's heart attack, that "company expectations would still need to be met"; and (3) Cablevision's overall unrealistic expectations for his job performance. (<u>See</u> Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 1-2, ECF No. 31.) But while Pagan may disagree with his performance reviews and the expectations Cablevision had for him, there is absolutely no evidence in the record that Cablevision gave him those reviews or set those expectations <u>because of</u> his alleged disability. On the contrary, the record clearly demonstrates that the negative comments in Pagan's annual performance reviews—which predate any injury, resulted in two separate performance improvement plans (the 2015 PIP and the 2016 PAP), and eventually led to Pagan's termination—were tied directly to Pagan's deficient job performance.

As described above, Pagan's supervisors separately identified two primary issues with Pagan's job performance: (1) he closed fewer tickets than expected; and

(2) he did not work as quickly or efficiently as expected.  Those deficiencies were first identified in 2008, and were consistently noted in his annual performance reviews up until his termination in 2016.  Plaintiff argues that Cablevision's expectations were unrealistic based on the geographic territory he covered.  But that has nothing to do with his alleged disability.  In other words, whether a company sets and subsequently reprimands an employee for failure to meet unrealistic expectations is a run-of-the mill dispute between employer and employee.  Absent any evidence that the employer set those expectations or punished the employee <u>because of</u> the employee's disability, such a dispute is not basis for an ADA discrimination claim.  Here, plaintiff's job assignment and Cablevision's criticisms predate any alleged disability, and there is no reason to believe the two things are tied together.

Other than the bare allegations in Pagan's complaint and his unsupported assertion that Cablevision's "natural understanding of the challenges of [his] geographical territory turned into an annoyance" following his requests for medical leave, (Pl.'s Opp'n at 5), there is simply nothing in the record to suggest that Cablevision rated Pagan poorly or terminated him because of his disability. Further, Valente's comment that "company expectations would still need to be met" is completely innocuous; it certainly does not "giv[e] rise to an inference of discrimination."  <u>Davis</u>, 804 F.3d at 234 (internal quotation omitted).

Even if plaintiff had established a <u>prima facie</u> case (the Court concludes he has not), Cablevision has provided a legitimate, non-discriminatory reason for

plaintiff's ultimate termination—namely, his deficient job performance. Thus, to the extent any of defendant's conduct could be construed as discriminatory, defendant has satisfied its burden under the <u>McDonnell Douglas</u> burden-shifting framework to articulate a non-discriminatory reason for the adverse employment action. Plaintiff has failed to produce any evidence that Cablevision's non-discriminatory reason was pretextual, or that "the employer's action was at least in part motivated by discrimination." <u>Davis</u>, 804 F.3d at 235. Therefore, even if a <u>prima facie</u> case had been made, the Court would still dismiss plaintiff's discrimination claim.

Because plaintiff has failed to create a triable fact as to the requisite nexus between his termination and any alleged discrimination, his ADA discrimination claim must be DISMISSED.

B. <u>Failure to Accommodate</u>

Separately, plaintiff alleges that defendant failed to provide reasonable accommodations for his disability in violation of the ADA. (<u>See</u> Compl. ¶¶ 14-20.) As previously noted, to establish a <u>prima facie</u> case of failure to accommodate, plaintiff must demonstrate, <u>inter alia</u>, that the defendant refused to make a reasonable accommodation. <u>See</u> <u>Graves</u>, 457 F.3d at 184. Here, plaintiff has failed to create a triable issue as to that critical element.

As an initial matter, Pagan's claim fails under this theory for the same reason as stated above—there is no evidence to suggest that Cablevision ever took an adverse employment action against him because of his disability. As the Second

Circuit has held, a failure to accommodate claim requires that the plaintiff suffer some adverse employment action. See Baker v. The Home Depot, 445 F.3d 541, 546 (2d Cir. 2006) (requiring that plaintiff show she "was disciplined for failure to comply with [a] conflicting employment requirement"); see also Marmulszteyn v. Napolitano, 523 F. App'x 13, 14 (2d Cir. 2013). Because Pagan has failed to create a triable issue that any of the negative comments or ratings in his yearly performance reviews or his eventual termination was tied in any way to disability discrimination, his failure to accommodate claim fails for that reason alone.

Alternatively, the Court concludes that Cablevision provided the requisite "reasonable accommodations" as a matter of law. Plaintiff claims that he requested two separate accommodations following his heart attack: (1) to refrain from heavy lifting; and (2) to "operat[e] at a slower pace." (See Pl.'s Opp'n at 9.) As to the first request, it is undisputed that Cablevision assigned an additional employee, John Chen, to Pagan's territory in order to assist him with heavy lifting. As the Second Circuit has repeatedly held, employers are obligated to grant a "reasonable accommodation", not necessarily "the accommodation the employee prefers." Cosme v. Henderson, 287 F.3d 152, 158 (2d Cir. 2002). Assigning an additional employee to perform any heavy lifting that might be required clearly "eliminate[s] the conflict" between the job requirement and the disability, and therefore is sufficient as a matter of law.

As for the second request, to "operat[e] at a slower pace," there are several issues. First, plaintiff has provided absolutely no evidence, besides his own

conclusory assertions, that such an accommodation was necessary.  It is well-established that "the ADA does not require the employer to provide every accommodation the disabled employee may request so long as the accommodation provided was reasonable." Wenc v. New London Bd. Of Educ., 702 F. App'x 27, 31 (2d Cir. 2017) (internal quotation omitted).  Second, it is well-established that "[a] reasonable accommodation can never involve the elimination of an essential function of a job." Shannon, 332 F.3d at 100.  It is absolutely clear that closing tickets was an essential function of Pagan's job as a Field Service Analyst. See Stone, 118 F.3d at 97.  Although Pagan's job description may not have specified a required ticket closure rate, it is clear based on Pagan's annual performance reviews that Cablevision expected its Field Service Analysts to complete a certain number of tickets per day.  Thus, it would be unreasonable to require Cablevision to grant Pagan an accommodation in the form of reducing that expected closure rate.  Finally, it is undisputed that Cablevision assigned an additional employee, John Chen, to assist Pagan with his assigned territory.  To the extent Pagan required any accommodation in the form of reduced workload, Cablevision clearly provided it.

Because plaintiff has failed to create a triable fact as to Cablevision's failure to provide a reasonable accommodation claim, that claim must be DISMISSED.

C.     Hostile Work Environment

Plaintiff additionally claims that Cablevision created a "hostile and abusive working environment" (See Compl. ¶¶ 23-24).  In order to succeed on a hostile work

environment claim under the ADA, plaintiff must demonstrate "that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive," and that "[t]he incidents complained of were "sufficiently continuous and concerted in order to be deemed pervasive." Littlejohn, 795 F.3d at 321 (internal quotations and citation omitted). Plaintiff's allegations fail to satisfy that standard. As previously noted, there is no evidence in the record that any of plaintiff's negative performance evaluations were tied in any way to his alleged disability. In addition, Valente's comment that "company expectations would still need to be met" is completely innocuous and plainly insufficient to sustain a hostile work environment claim. Accordingly, plaintiff's hostile work environment claim must be DISMISSED.

## IV.     CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment at ECF No. 25 is GRANTED in its entirety. The Clerk of Court is directed to close any open motions and to terminate this action.

SO ORDERED.

Dated:        New York, New York
              July 3, 2018

                                    _____
                                    KATHERINE B. FORREST
                                    United States District Judge